1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   KEITH JEROME WRIGHT,                    No.  2:16-cv-1806-JAM-EFB P

12                    Petitioner,

13         vs.                               FINDINGS AND RECOMMENDATIONS

14   M.E. SPEARMAN,

15                    Respondent.

16

17         Petitioner is a state prisoner proceeding without counsel with a petition for a writ of

18   habeas corpus pursuant to 28 U.S.C. § 2254.[1]  Petitioner challenges a judgment of conviction

19   entered against him on October 22, 2012 in the Superior Court of Sacramento County on: (1)

20   three counts of first degree residential burglary pursuant to Cal. Penal Code § 459, (2) four counts

21   of first degree robbery pursuant to Cal. Penal Code § 211, (3) four counts of forcible oral

22   copulation pursuant to Cal. Penal Code § 288a(c)(2), (4) two counts of kidnapping to commit

23   robbery pursuant to Cal. Penal Code § 209(b)(1), (5) three counts of false imprisonment pursuant

24   to Cal. Penal Code § 236, and (6) three counts of kidnapping pursuant to Cal. Penal Code § 207

25   (a).[2]  On direct appeal one count of kidnapping with intent to rob and three counts of false

26   ───────────────────
           [1] The matter has been referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)
27   and Local Rule 302.

28         [2] Petitioner was also found guilty of several enhancements: (1) use of a firearm pursuant

                                            1

imprisonment were reversed and several sentences were stayed. *See People v. Wright*, 2015 WL 4931489, at \*23 (Cal.App. 3 Dist., 2015). Petitioner seeks federal habeas relief on the following grounds: (1) evidence obtained pursuant to an unlawful arrest was used to convict him; (2) the prosecutor committed misconduct during the closing argument when she argued facts not in evidence; (3) the prosecutor committed misconduct during the closing argument by arguing that uncalled witnesses could have rebutted petitioner's trial testimony; (4) his trial counsel rendered ineffective assistance by failing to conduct a reasonable pre-trial investigation; (5) his trial counsel rendered ineffective assistance by failing to object to prosecutorial misconduct during the closing argument; and (6) the trial court erred when it instructed the jury that "nothing that the parties say is evidence." For the reasons set forth below, petitioner's application for habeas corpus relief must be denied.

**I. Background**

In its unpublished memorandum and opinion which partially affirmed petitioner's judgment of conviction, the California Court of Appeal for the Third Appellate District provided the following factual summary:

> During a one-month period in the summer of 2011, defendant Keith Wright entered three separate residences in the Natomas area of Sacramento and robbed the residents of their valuables at gunpoint. He entered all three residences between midnight and 12:30 a.m. In two of the incidents, he locked the victims in the trunk of their car before he made his escape. In the last incident, the resident was a woman living alone, and he forced her to orally copulate him before stealing her money and valuables.
>
> Much of the property stolen in the home robberies was later recovered at defendant's home. In one of the robberies, defendant took some rare foreign currency, which he later exchanged at a currency exchange. Security footage showed defendant and his mother exchanging the foreign currency. All but one of the victims identified defendant as their attacker. The other said defendant looked like the attacker, but could not make a positive identification.

---

to Cal. Penal Code § 12022.53(b); (2) use of a deadly weapon pursuant to Cal. Penal Code §12022.3(a), (3) forcible oral copulation during commission of a burglary pursuant to Cal. Penal Code § 667.61(e)(2), and (4) use of a firearm during commission of forcible oral copulation pursuant to Cal. Penal Code § § 667.61(e)(3).

2

The jury convicted defendant on multiple counts of first degree residential burglary, first degree robbery, kidnapping, kidnapping to commit robbery, false imprisonment, and forced oral copulation. The trial court sentenced defendant to an indeterminate term of 114 years to life plus 120 years 8 months.

. . .

A. Crimes Against Gary Bryant

The first of the home-invasion robberies occurred around 12:25 a.m. on July 21, 2011. The victim was 60–year–old Gary Bryant, who was at his home in south Natomas. Bryant's testimony was hampered somewhat by a stroke he suffered either in January 2011 or January 2012. The stroke affected his ability to describe events and details, but it did not affect his ability to remember important events, and he considered the incident an important event.

Bryant opened his exterior garage door and took out a load of garbage. He returned inside the house to collect more trash, leaving the exterior garage door open and the door from the garage to the house unlocked. As he was in the hallway preparing to take out the second load of garbage, he saw a man in the hallway pointing a gun at him. The man was Black, approximately six feet one inch tall, muscular, and in his mid-twenties to early thirties. Bryant identified defendant as the person he saw, both at the preliminary hearing and at trial. Defendant was wearing a long-sleeve, hooded sweatshirt with the hood up, dark pants, and two-tone tennis shoes.

Defendant pointed the gun at Bryant and demanded "[w]here is the fucking guns and where is the money[?]" Defendant ordered Bryant to get on his knees and crawl from room to room. Defendant made Bryant crawl to five different rooms, with a gun to Bryant's neck, repeatedly demanding money and guns. Defendant repeatedly told Bryant not to look at him. Defendant rummaged through everything in the house. Bryant estimated defendant was inside the house for about two hours.

Defendant finally made Bryant crawl to the garage and lie down. He lay or knelt there for about a half-hour while defendant went through Bryant's car. Bryant waited another half-hour, and not hearing anything, went back into the house. Bryant's phone was disconnected, so he went next door to call 911. Bryant later found his cell phone with the battery removed in the toilet.

Defendant took three guns from Bryant: a semiautomatic, a revolver, and a shotgun. He also took a Garmin global positioning satellite (GPS) unit, a radar detector, and a handheld safe and its contents and keys. Inside the safe was $4,000 in cash, and collector coins, including Susan B. Anthony dollars.

B. Crimes Against Rashid and Uddin

The second incident occurred around 12:30 a.m. on August 8, 2011. Babar Rashid and Arbab Uddin lived in a house in south Natomas.

Uddin was in the garage smoking a cigarette and lying on a couch with the garage door open, when a man came up behind him with a gun. The man was African–American, approximately six feet one inch to six feet three inches tall, about 230 to 250 pounds, and in his early to mid-thirties. Uddin identified defendant at trial as the intruder. The man grabbed Uddin by the collar, made him stand up, and walked him to the door into the house while holding a gun to his head. He told Uddin to close the garage door, and asked how many people were inside the house. Uddin told him there was only one other person. They went inside and found Rashid asleep on the couch in the living room.

Rashid woke up and saw Uddin with a man holding a gun to his head. Rashid described the gunman at trial as African–American, six feet one inch to six feet two inches tall, at least 220 to 230 pounds, and between 30 and 40 years old. He was wearing a hooded sweatshirt and his face was covered with a bandana. Rashid was not able to definitively identify defendant at trial, but stated that defendant was the same height and build, same race and skin tone as the intruder.

The gunman kept asking "[w]here the fuck is the gun." He also asked if they had marijuana. He made the two go upstairs to Rashid's bedroom and get down on the floor. When he demanded money, Rashid told him there was money in his closet. Rashid had about $500 in United States currency, and between 7,500 to 9,000 Qatari Riyals. Defendant proceeded to take things out of Rashid's closet and put them in a pillowcase he took off of one of the pillows. He then made the two go to Uddin's bedroom. He told them not to look at his face. He took around $100 cash, including Pakistani money. He then took them back downstairs, where he took a Play Station 3. He took the pair into the garage and asked for the car key. He opened the trunk and made them get in.

While they were in the trunk, they could hear the gunman upstairs in the two bedrooms directly above the garage. He was upstairs approximately 15 minutes before coming back to the garage to ask Rashid and Uddin where to find the "weed" and the gun. They told him they did not have any. A few minutes later they heard the front door close and heard the man running outside. They eventually exited the trunk by using the release button. They went to a neighbor's house to call the police.

Defendant took Uddin's and Rashid's cell phones and the cash, the Play Station 3, and several games for the Play Station 3, including Call of Duty: World at War, Call of Duty Four: Modern Warfare, Call of Duty: Modern Warfare Two, Grand Theft Auto Four, and Madden Ten.

At trial Uddin identified the jeans worn by the intruder by the color, style, and cuts and hole in one leg. The jeans were found in defendant's residence.

A forensic examination of a laptop recovered from defendant's residence revealed that shortly after the incident at Uddin and

Rashid's home, at 2:24 a.m., an internet search was conducted for "Qatar Central Bank, 500 riyals in USA currency...." Two more searches were done from the computer comparing Qatar and United States currency at 2:28 a.m. and again at 2:36 a.m. The next day, August 9, 2011, around 11:00 a.m., defendant and his mother, Elizabeth Stewart, went to the Travelex office on Capitol Mall in Sacramento. They exchanged 7,500 Qatari Riyal, all in 500 Riyal bills, which amounted to $1,807.31. The consultant who exchanged the money for defendant and his mother testified that Qatari Rivals are very rarely exchanged in Sacramento, and that this was only the first or second time she had seen the currency in the 14 years she had worked at Travelex.

C. Crimes Against Jane Doe

On August 21, 2011, Jane Doe lived in an apartment in the Natomas area of Sacramento. Around midnight she was using her computer and had her headphones on. She had the sliding door to the enclosed patio unlocked and open to save energy. She heard a noise, looked around, and saw a man inside her apartment, pointing a gun at her. The man was African–American, at least 200 pounds, a little over six feet tall, and Doe guessed his age was mid-twenties by the clothing he wore. He was wearing a white, long-sleeve, hooded shirt. He wore the hood up and wore a bandana covering his face. The bandana covered everything but his eyes. In court, Doe identified the defendant as her attacker.

Defendant told her to get down on the ground and not to look at him. After about two minutes, he told her to go into her bedroom. Defendant found two cell phones near her bed, which she told him were not activated. He took the batteries out of the phones and tossed them into the toilet. He told her to take off her clothes. Defendant ordered her into the bathroom and told her to lie face down. He looked through her closet, and asked her if she had anything valuable or any jewelry. He asked her where she put the money. When Doe told him she had no cash or valuables, he called her a liar.

Defendant told her to sit back on the bed, and allowed her to put her underwear back on because she was on her menstrual cycle. He threatened her and told her he would not do anything to her if she gave him something. He asked her if she knew who sent him there to kill her. Then, as he pointed his gun at her, he told her to unzip his pants and pull out his penis and suck on it.

She was crying and gagging, but he forced her. Doe estimated she performed oral sex on defendant for a total of 15 to 20 minutes. During that time she stopped, took his penis out of her mouth, then started again five to ten times. He ejaculated all over her chest and in her mouth. Some of it got on her thighs as well. He told her to go to the bathroom and wash off and brush her teeth.

Defendant told Doe to get dressed, then told her to get her wallet. He told her to open it and take out any cash, but she only had a dollar. He then asked her how much she had in the bank and where

she banked. She told him she had money in the bank at Wells Fargo. He asked what her daily limit was, and she told him it was $300.

She drove her car with defendant in the passenger seat to the nearest Wells Fargo. He told her where to park and which automated teller machine (ATM) to use. She withdrew $300. He told her to try again, so she tried again twice, but was not able to get any more money. They went back to the car and he told her to drive to the Bank of America. She tried three times at the Bank of America, but was unable to withdraw any money. She drove back to her apartment.

When they went back inside the apartment, he made her look for valuables, and got upset when she did not find any. He threatened to shoot her if she did not find something valuable to give him. She decided to give him her platinum wedding rings so he would leave and not harm her. But after she gave them to him, he kept threatening her.

He told her to go back into the living room, and before he came into the room she hid her cell phone, which was in the back pocket of her shorts between the sofa cushions. He asked her where her cell phone was. She told him he got rid of all her cell phones. He noticed a phone box on her dining table. It was a phone that Doe's sister, Katie, had just purchased for Doe's daughter. Doe had entered her sister Katie's number into the phone. Defendant put the phone in his pocket.

He took her driver's license, saying he needed proof in case she called the cops on him. He also ordered her back into her bedroom, told her to take off her top, told her to smile and act as if she was having the best time of her life, and took a picture with the phone she purchased for her daughter. He then ordered her to go into the garage, and climb into the trunk of her car. He closed her in the trunk. He told her to wait ten minutes before she got out. She waited, then went back in the apartment, got the phone she had hidden, and called her brother. Her brother called 911.

In addition to the $300, defendant took Doe's platinum wedding ring, her external hard drive, her iPod Nano, her driver's license, and the new cell phone her sister bought for her daughter.

Doe's mouth, chest, and thigh were swabbed for secretions. A DNA analysis of the chest and thigh swab were the same as defendant's DNA profile. The DNA profile was estimated to occur approximately 1 in 17 septillion of the African–American population.

Forensic examination of the laptop computer recovered from defendant's residence revealed that between 11:16 p.m. and 11:59 p.m. on the night after the morning Doe was attacked, seven searches were conducted of "Natomas home invasions" and "Natomas home invasions' suspect" and similar searches.

## D. Investigation of Defendant

Police focused on defendant after discovering the exchange of Qatari Riyal currency in Stewart's name. They discovered her son, defendant, lived near her in Natomas, and that he fit the physical description of the suspect in the home invasion robberies. They also learned that the cell phone that had been taken from Doe was powered on once for a brief amount of time on August 23, 2011. The phone pinged off of a tower that served the area of defendant's residence.

Defendant was taken into custody. His house was searched. At his home, police found Rashid's Play Station 3, five games taken from Rashid and Uddin's home, some Pakistani currency, Qatari currency, Uddin's cell phone, Rashid's cell phone, Bryant's hand held safe, Bryant's shotgun, Bryant's Garmin GPS unit and mount, stamped envelopes like the ones Bryant kept coins in and collector coins, including Susan B. Anthony dollars, like those stolen from Bryant, Doe's pink iPod, and Doe's daughter's cell phone. The key to Bryant's safe was found on defendant's key ring. Also recovered from defendant's house was a bandana that matched the bandana defendant wore during the Doe assault.

A forensic examination of defendant's cell phone revealed a series of text exchanges with Latoya Richardson, a friend of defendant's. The exchange began with a 12–digit number (120770302783) Richardson texted to defendant. Defendant admitted this was an eBay sales number. Defendant sent a message back saying, "It all wrong, the ring is blurry & there is no certificate posted. The discription is off, the center dimond is 0.51." Richardson answered, "Ok i will send the certificate and log on now so u can edit it, i got some more pics on my camera! Relax it can be fixed." Approximately five minutes later, Richardson wrote, "U rushing me, dam if u would just trust me and gave me a couple of days it wouldn't be a rushed job! Either u can let me fix it or u can!" Defendant replied, "The ring should be in the photo solo, white people do trip on buying a use ring from Black folks. Lol." Richardson wrote, "If u want it done right, give me time to do it! Don't knock me, i was rushed ok!" Near the end of the conversation, after Richardson complained about being rushed, defendant wrote, "Man its been two days & all u need is two photo & its perfect what u talking about? Two photos." Richardson replied, "Owwww! Yeah true but its not like i don't do shit all day! An its been 1 day keith. U gave it 2 me yesterday morning! Its good tho!"

Documents from eBay indicated that item number 120770302783 was a ladies platinum wedding set. The price was $611 and the sale started August 29, 2011, and ended September 5, 2011. The seller's name was LaToya Richardson.

## E. Defense

A defense expert testified regarding the unreliability of eyewitness testimony.

Defendant testified on his own behalf. He testified he was six feet three or four inches tall and weighed 310 pounds. He claimed he had not been at any of the victims' houses on the relevant dates. He said the property found at his house was either purchased by him or given to him by someone who owed him a debt. He claimed one of the persons he purchased the property from was Sony Lee, Jane Doe's brother. Defendant confirmed at trial that Sony's name was spelled and pronounced like the manufacturer of the Sony Play Station. Defendant claimed he received the Qatari Riyals from Sony Lee. Sony asked him to exchange the currency because defendant's wife worked for a bank. On rebuttal, Sonny (not Sony) Lee, Jane Doe's brother, testified he did not know defendant.

Defendant claimed he had dated Jane Doe for about nine months, although he was married. He claimed she gave him the cell phone containing her seminude picture and the iPod nano. He claimed that on August 21, Doe came to Madera, where he was attending a family reunion. They met at a Wal–Mart. She was picking up her children from her ex-husband. He assumed she picked them up in Modesto, which he claimed was half-way between Sacramento and San Jose, where the ex-husband lived. He said she performed oral sex on him while they were in the Wal–Mart parking lot. Afterward, he went back to his family reunion. Later that night he went with two people whose names he could not remember to a strip club in Fresno. He could remember neither the name nor location of the strip club. He never told law enforcement either that he was at a strip club in Fresno the night of Doe's attack, or that he had oral sex with Doe in the Wal–Mart parking lot that day because they never asked.

Defendant claimed the text messages with Richardson were about a ring she had and was trying to sell. He was just helping her out and giving her advice.

*People v. Wright*, 2015 WL 4931489, at *1-6 (Cal.App. 3 Dist., 2015) (unpublished).

## II. Standards of Review Applicable to Habeas Corpus Claims

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. *See Wilson v. Corcoran*, 562 U.S. 1,5 (2010); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Park v. California*, 202 F.3d 1146, 1149 (9th Cir. 2000).

Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the

merits in State court proceedings unless the adjudication of the claim -

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. *Thompson v. Runnels*, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing *Greene v. Fisher*, 565 U.S. 34 (2011)); *Stanley v. Cullen*, 633 F.3d 852, 859 (9th Cir. 2011) (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." *Stanley*, 633 F.3d at 859 (quoting *Maxwell v. Roe*, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." *Marshall v. Rodgers*, 133 S. Ct. 1446, 1450 (2013) (citing *Parker v. Matthews*, 132 S. Ct. 2148, 2155 (2012) (per curiam)). Nor may it be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct. *Id.* Further, where courts of appeals have diverged in their treatment of an issue, it cannot be said that there is "clearly established Federal law" governing that issue. *Carey v. Musladin*, 549 U.S. 70, 77 (2006).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. *Price v. Vincent*, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. [3] *Lockyer v.*

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be

*Andrade*, 538 U.S. 63, 75 (2003); *Williams*, 529 U.S. at 413; *Chia v. Cambra*, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*, 529 U.S. at 412. *See also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *Lockyer*, 538 U.S. at 75 (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'"). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103.

If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims. *Delgadillo v. Woodford*, 527 F.3d 919, 925 (9th Cir. 2008); *see also Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment. *Stanley*, 633 F.3d at 859; *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When

---

overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." *Stanley*, 633 F.3d at 859 (quoting *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004)).

a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Richter*, 562 U.S. at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. *Johnson v. Williams*, 568 U.S. 289, 292 (2013).

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). *Stanley*, 633 F.3d at 860; *Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." *Himes*, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98.

A summary denial is presumed to be a denial on the merits of the petitioner's claims. *Stancle v. Clay*, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." *Richter*, 562 U.S. at 98. This court "must determine what arguments or theories ... could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court." *Id.* at 102. The petitioner bears "the burden to demonstrate that 'there was no reasonable basis for the state court to deny relief.'" *Walker v. Martel*, 709 F.3d 925, 939 (9th Cir. 2013) (quoting *Richter*, 562 U.S. at 98).

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

1    habeas court must review the claim de novo.  *Stanley*, 633 F.3d at 860; *Reynoso v. Giurbino*, 462

2    F.3d 1099, 1109 (9th Cir. 2006); *Nulph v. Cook*, 333 F.3d 1052, 1056 (9th Cir. 2003).

3    **III.  Petitioner's Claims**

4         **A.        Fourth Amendment Claim**

5              Petitioner argues that his Fourth Amendment rights were violated when DNA evidence

6    obtained pursuant an unlawful, unrelated arrest in February 2011 was used to secure the

7    convictions he now challenges.  ECF No. 1 at 8-10.[4]  He specifically alleges that, on February 1,

8    2011, a Sacramento County police officer pulled him over for a traffic violation.  *Id*. at 8.  During

9    the stop, petitioner and his passenger – one Walter Green – stood on the street curb.  *Id*.  In his

10   report, the arresting officer stated that he overheard petitioner threaten, while speaking into his

11   cell phone, "Man . . . this motherfucker's gonna get popped."  *Id*. at 24 (Ex. A).  The arresting

12   officer determined that petitioner's driver's license was suspended.  *Id*.  Petitioner was then

13   arrested for driving on a suspended license and for the threat against the officer.  *Id*. at 24-25.  As

14   a consequence of the arrest, a buccal swab was taken pursuant to California Penal Code section

15   296 (a).  *Id*. at 9.  Petitioner was never prosecuted based on the events of February 1, 2011.  *Id*.

16   However, in August of 2011, the Sacramento County Crime Lab matched petitioner's DNA to a

17   secretion taken from a victim of sexual assault.  *Id*. at 9-10.  Petitioner was arrested and search

18   warrants were obtained for his residence and vehicle.  *Id*. at 10.  Search warrants were also

19   obtained for his mother's residence and her vehicle.  *Id*.  The warrants were executed and led to

20   evidence which connected petitioner to the aforementioned home invasions and sexual assault of

21   Jane Doe.  Clerk's Transcript on Appeal, Volume I at 183-184.

22             Petitioner raised this claim in a state habeas petition and it was denied in a reasoned

23   decision by the Sacramento County Superior Court.  Lodg. Doc. No. 9.  Petitioner subsequently

24   raised it before the court of appeal and California Supreme Court, both of which issued summary

25   denials.  Lodg. Docs. Nos. 13 & 15.  Then, petitioner raised the claim again in a second round of

26   /////

27   _____

28        [4] Page number citations such as this one are to the page numbers reflected on the court's
     CM/ECF system and not to page numbers assigned by the parties.

     12

state habeas petitions. Lodg. Doc. Nos. 16 & 18. These, too, were denied by the court of appeal and California Supreme Court. Lodg. Doc. Nos. 17 & 19.

Respondent contends that this claim is not cognizable on federal habeas review. The court agrees. In *Stone v. Powell* the United States Supreme Court held that, so long as a petitioner was provided an opportunity for full and fair litigation of a Fourth Amendment claim in state court, a federal court was precluded from granting habeas relief on the ground that evidence was obtained in violation of that amendment. 428 U.S. 465 (1976). The Ninth Circuit has emphasized that "[t]he relevant inquiry is whether petitioner had the opportunity to litigate his claim, not whether he did in fact do so or even whether the claim was correctly decided." *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 899 (9th Cir. 1996). Petitioner was afforded a full and fair opportunity to litigate this claim in state court when his trial counsel filed a motion to suppress the evidence pursuant to § 1538.5 (Clerk's Transcript on Appeal Vol. I at 180-213) and, as such, this claim is not cognizable. *See Gordon v. Duran*, 895 F.2d 610, 613 (9th Cir. 1990) (citing Cal. Penal Code § 1538.5 and noting "[u]nder California law, a defendant can move to suppress evidence on the basis that it was obtained in violation of the fourth amendment.").

To the extent petitioner alleges that the use of this evidence violated his Fourteenth Amendment rights, this claim also fails. He may not circumvent *Stone* merely by characterizing his Fourth Amendment claim as a Fourteenth Amendment due process violation. *See, e.g., Gilmore v. Marks*, 799 F.2d 51, 57 (3rd Cir. 1986) ("Even though due process violations, unlike some Fourth Amendment violations, are cognizable in a habeas proceeding in federal court, petitioner may not cloak his or her Fourth Amendment claim in due process clothing to circumvent *Stone v. Powell*.") (internal citations omitted).

### B. Prosecutorial Misconduct

Petitioner argues that the prosecutor committed misconduct by (1) arguing facts not in evidence when she stated that eBay photographs were only available for 90 days and (2) by arguing that uncalled witnesses could have been summoned to rebut petitioner's trial testimony. ECF No. 1 at 13-18.

/////

### 1.     Applicable Legal Standards

A habeas petition raising prosecutorial misconduct will not be granted unless the misconduct "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Greer v. Miller*, 483 U.S. 756, 765 (1987).  "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).  As such, in deciding whether a prosecutor's remarks rendered a trial fundamentally unfair, those remarks must be weighed in the context of the entire proceeding.  *Boyde v. California*, 494 U.S. 370, 385 (1990); *Darden v. Wainwright*, 477 U.S. 168, 179-182 (1986).  Additionally, because "improvisation frequently results in syntax left imperfect and meaning less than crystal clear. . . . a court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647 (1974).  Lastly, even where prosecutorial misconduct gives rise to a due process violation, habeas relief is only warranted if that misconduct is prejudicial under the harmless error test established in *Brecht v. Abrahamson*, 507 U.S. 619 (1993).

### 2.     Analysis

#### a.     Arguing Facts Not in Evidence

Petitioner raised this claim on direct appeal and the court of appeal denied it, reasoning:

> Defendant correctly argues that the prosecutor argued facts not in evidence when she stated that eBay photographs were available only 90 days. However, the error was harmless.
>
> During her initial closing argument, the prosecutor argued that the text messages between defendant and Richardson regarding the eBay transaction were evidence they were selling the platinum wedding ring set defendant stole from Doe on eBay. Defense counsel's argument cast doubt on the prosecutor's theory by pointing out that there were no pictures of the eBay transaction to confirm they were the rings stolen from Doe. In rebuttal, the prosecutor stated, "EBay, [defense counsel] said, you know, there's no evidence of that. There's no photos shown. Well, there are no photos. They are only kept for 90 days. You can't get them after 90 days."

Defense counsel objected that those facts were not in evidence, but the trial court overruled the objection. The prosecutor continued, "That's why I showed you those text messages. That is the evidence. That and those documents from eBay."

It was error for the prosecutor to refer to the fact that eBay photographs are deleted after 90 days when that fact was not in evidence. However, the error was not a violation of the federal Constitution, and was harmless under California law.

"The applicable federal and state standards regarding prosecutorial misconduct are well established. "A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; *People v. Espinoza* (1992) 3 Cal.4th 806, 820.) Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Espinoza*, *supra*, 3 Cal.4th at p. 820.)' " (*People v. Hill*, *supra*, 17 Cal.4th at p. 819.)

The prosecutor's argument did not violate the federal Constitution because the one incident of arguing facts not in evidence did not constitute a "pattern of conduct" that infected the trial with unfairness.

The prosecutor's statement referring to facts not in evidence was misconduct under California law. (*People v. Hill*, *supra*, 17 Cal.4th at p. 828.) Despite the misconduct, the error is not sufficient to merit reversal of defendant's conviction. Prosecutor misconduct does not require reversal in the absence of prejudice. (*People v. Bolton* (1979) 23 Cal.3d 208, 214.) Where, as here, there is no federal constitutional violation as a result of the prosecutor's misconduct, the test of prejudice is "whether it is 'reasonably probable that a result more favorable to the defendant would have occurred had the district attorney refrained from the comment attacked by the defendant. [Citations.]' [Citation.]" (*Id*. at p. 214.) Our conclusion is the same under the harmless beyond a reasonable doubt standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705].

The evidence against defendant was overwhelming. All four victims either identified defendant as the perpetrator or indicated he generally matched the perpetrator's height, weight, race, and age. One of the victims identified a piece of clothing at defendant's residence as that worn by the perpetrator. The evidence was overwhelming that all the crimes were committed by the same person because: (1) all the victims and the defendant lived in the same geographic area; (2) all the crimes took place after midnight; (3) in all instances the perpetrator entered through an open door; (4) in all the crimes the suspect was armed with a handgun; (5) the suspect told all victims not to look at him; (6) the suspect asked three of the victims where the "fucking" guns and money were; (7)

15

the suspect made three of the victims lie on the floor; (8) in two of the incidents defendant forced the victims in the trunks of their cars; and (9) in two of the incidents he disassembled the victims' cell phones and threw them in the toilet. A bandana identical to the one worn in the Doe assault was identical to that found in defendant's garage and stolen property from all three robberies was found at defendant's home. Within hours of Rashid's Qatari Riyals being stolen, a search for the value of Qatari Riyals was performed on defendant's computer. The next day, defendant went with his mother to exchange for dollars the quantity of Qatari Riyals stolen, an exceedingly rare transaction in Sacramento. On the day Doe was assaulted, defendant conducted multiple internet searches regarding Natomas home invasions. Defendant's DNA was found on Doe.

A half-carat platinum wedding ring was stolen from Doe, and a week later defendant texted a friend regarding her efforts to sell on his behalf a half-carat platinum wedding ring. In light of the overwhelming evidence against defendant, and numerous fabrications in his testimony, the jury would have concluded defendant was guilty of all charges even if the prosecutor had not told the jury there were no pictures of the ring sold on eBay because the records were destroyed after 90 days.

*Wright*, 2015 WL 4931489, at *8–9 (internal citation marks omitted). Petitioner presented this claim to the California Supreme Court (Lodg. Doc. No. 5 at 15-16) and it was summarily denied (Lodg. Doc. No. 6).

The court of appeal's denial of this claim was reasonable. As it pointed out, the evidence supporting petitioner's conviction was overwhelming and, as such, there is simply no basis by which to conclude that the prosecutor's remarks about eBay photographs, error though they were, rendered the trial as a whole fundamentally unfair.

### b. Uncalled Witnesses

Petitioner also raised his claim regarding uncalled witnesses on direct appeal and it too was denied by the court of appeal:

The prosecutor argued in closing argument that defendant's testimony was entirely fabricated. As the prosecutor argued, given the DNA evidence and the discovery of the victims' property at his home, defendant had to come up with something. Thus, to counter the most damaging evidence, the DNA, defendant claimed he had a consensual sexual relationship with Jane Doe. To counter the stolen property in his garage, he claimed he purchased it from Doe's brother Sonny, whose name he pronounced incorrectly.

/////

16

It was in the context of arguing that defendant's testimony was a complete fabrication, that the prosecutor made the following comment:

"If I wanted to question Mr. Wright on everything that he testified to the other day, we'd still be going. I'd have called someone from Nike. I'd have called someone from EA Sports. I would have called a whole bunch more people, but sometimes you just have to know when to say when. And he had told so many lies at that point it was time to say when. That's it.

"The defense would just have you believe that all of these victims are liars, all of them.

"As I said in my opening argument, the only person that sat in that stand and had to admit to being a liar because he was forced to was the defendant."

Defendant argues this comment deprived him of his Sixth Amendment right of confrontation because it implied there were additional witnesses with evidence favorable to the prosecution.

. . .

The prosecutor's argument did not suggest that she was in possession of undisclosed inculpatory evidence that was being withheld from the jury, nor did she attempt to state in her argument what the testimony of any such witness would be. The prosecutor did not claim that she actually had more witnesses she could have called to testify regarding the untruth of defendant's statements, only that his testimony was so full of untruths that bringing in all the witnesses to give such testimony would have been infeasible because of the undue consumption of time. No reasonable juror would have construed the prosecutor's statements as implying that she was asking the jury to take her word that there were witnesses ready to impeach defendant's testimony if called. That was not the point of her comments, only that defendant's lies were so abundant, it would be impractical to bring in testimony to refute them all.

*Wright*, 2015 WL 4931489, at *7 (footnotes omitted). Petitioner presented this claim to the California Supreme Court (Lodg. Doc. No. 5 at 8-12) and it was summarily denied (Lodg. Doc. No. 6).

As a preliminary matter, respondent argues this claim is procedurally barred. ECF No. 15 at 38. The court need not reach this question, however, as the claim is clearly without merit. *See Franklin v. Johnson,* 290 F.3d 1223, 1232 (9th Cir. 2002) (in spite of an asserted procedural bar, courts are empowered to reach the merits of claims which are clearly without merit). As with petitioner's first claim for prosecutorial misconduct, he cannot overcome the fact that the

evidence supporting his guilt was overwhelming and, as such, cannot demonstrate that the prosecutor's comments regarding uncalled witnesses rendered his trial unfair. Moreover, the court of appeal's interpretation of the prosecutor's comments was not unreasonable and, viewed in that context, the prosecutor's statements were clearly permissible. *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991) ("In a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of the two sides is lying.").

### C. <u>Ineffective Assistance of Trial Counsel</u>

Petitioner brings two separate claims regarding the performance of his trial counsel.

First, he argues that trial counsel was ineffective in failing to conduct a reasonable pre-trial investigation. ECF No. 1 at 11. Petitioner claims that his trial counsel should have requested the presence of the officer who made the aforementioned arrest in February 2011. *Id*. at 12. Petitioner also argues that his trial counsel should have taken a statement from Walter Green, who was present during the February 2011 arrest. *Id*. Finally, petitioner contends that his trial counsel failed to file a motion pursuant to *Pitchess v. Superior Court*, 11 Cal.3d 531 (1974). ECF No. 1 at 12.

Second, petitioner argues that his trial counsel should have objected when, during the prosecutor's closing argument, it was argued that uncalled witnesses could have rebutted petitioner's trial testimony. ECF No. 1 at 18-19. He also contends that his counsel should have requested an admonition from the trial court for this purported misconduct. *Id*.

#### 1. <u>Applicable Legal Standards</u>

The clearly established federal law governing ineffective assistance of counsel claims is that set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To succeed on a *Strickland* claim, a defendant must show that (1) his counsel's performance was deficient and that (2) the "deficient performance prejudiced the defense." *Id*. at 687. Counsel is constitutionally deficient if his or her representation "fell below an objective standard of reasonableness" such that it was outside "the range of competence demanded of attorneys in criminal cases." *Id*. at 687-88 (internal quotation marks omitted).

"Counsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Richter*, 562 at 104 (quoting *Strickland*, 466 U.S. at 687).

Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. "The likelihood of a different result must be substantial, not just conceivable." *Richter*, 131 S. Ct. at 792.

### 2. <u>Analysis</u>

#### a. <u>Failure to Conduct a Reasonable Pre-Trial Investigation</u>

In a state habeas petition filed on February 21, 2014, petitioner stated that his trial counsel did not investigate the probable cause on which he was arrested in February 2011. Lodg. Doc. No. 8 at 5. It must be noted, however, that the February petition did not actually include this allegation among petitioner's actual grounds for relief. Rather, petitioner offered this statement under the section of the habeas form which tasks the petitioner with explaining why he failed to raise his habeas claim on direct appeal. *Id*. The statement regarding trial counsel's performance was confined to a single line which simply read: "[t]rial counsel did not investigate the probable cause to arrest pititioner (sic) or object to the mere suspicion of officer in court." *Id*. Petitioner did not expand upon his trial counsel's shortcomings in the memorandum accompanying the petition.

The February petition was denied by the Sacramento County Superior Court in a reasoned decision. Lodg. Doc. No. 9. That decision did not address the performance of petitioner's trial counsel or offer any indication that the court recognized it as a separate ground for relief. *Id*. Then, the petition was summarily denied on appeal by both the court of appeal and the California Supreme Court. Lodg. Doc. Nos. 13 & 15.

Petitioner filed a second round of habeas petitions in May of 2016, one with the court of appeal (Lodg. Doc. No. 16) and one with the California Supreme Court (Lodg. Doc. No. 18). These petitions also attacked the use of the evidence obtained in the February 2011 arrest. Lodg. Doc. No. 16 at 3; Lodg. Doc. No. 18 at 3. Unlike the earlier petition filed in February of 2014,

however, these petitions explicitly listed trial counsel's failure to investigate probable cause as a distinct ground for relief. Lodg. Doc. No. 16 at 4; Lodg. Doc. No. 18 at 4. The court of appeal denied its petition with unexplained citations to *In re Steele,* 32 Cal. 4th 682, 692, 10 Cal. Rptr. 3d 536, 85 P.3d 444 (Cal. 2004) and *In re Hillery,* 202 Cal. App. 2d 293, 20 Cal. Rptr. 759 (1962). Lodg. Doc. No. 17. The California Supreme Court denied its petition with an unexplained citation to *In re Clark* (1993) 5 Cal.4th 750, 767-769. Lodg. Doc. No. 19. These citations indicate that petitioner's second round petitions were denied on procedural grounds. *See In re Steele*, 32 Cal. 4th 682, 692, 10 Cal. Rptr. 3d 536, 85 P.3d 444 (Cal. 2004) ("a reviewing court has discretion to deny without prejudice a habeas corpus petition that was not filed first in a proper lower court"); *In re Hillery*, 202 Cal. App. 2d 293, 294, 20 Cal. Rptr. 759 (Cal. Ct. App. 1962) ("[T]his court has discretion to refuse to issue the writ . . . on the ground that application has not been made therefor in a lower court in the first instance."); *In re Clark*. 5 Cal.4th at 767-69 (referencing California state rule against repetitious and piecemeal litigation of claims).

Respondent argues that, for the purposes of AEDPA, the Sacramento County Superior Court's decision denying the February 2014 habeas petition should be recognized as the "last reasoned decision" on his claims related to trial counsel's failure to investigate probable cause. As noted *supra*, however, the February 2014 petition did not actually list trial counsel's performance as a ground for relief and the superior court's decision never addressed such a claim.[5] Regardless, this claim fails, for the reasons stated hereafter, even under the more liberal standard of *de novo* review. *See Cone v. Bell*, 556 U.S. 449, 472 (2009) (where state court did not reach merits of petitioner's claims because of procedural bar, the claim is reviewed de novo); *see also Sexton v. Cozner,* 679 F.3d 1150, 1156 (9th Cir. 2012) (noting that where a claim fails under de novo review "it necessarily fails under AEDPA's deferential review."). The court will, therefore, exercise that standard out of an abundance of caution. Additionally, in the interests of judicial economy, the court declines to resolve any questions of exhaustion or procedural viability which adhere to this claim. *See Franklin,* 290 F.3d 1223 at 1232 (9th Cir. 2002); *Cone*, 556 U.S.

---

[5] Respondent acknowledges as much, but argues that the court "implicitly" rejected the ineffective assistance claim. ECF No. 15 at 29.

at 451 n.3 (emphasizing that a habeas claim may be denied on the merits even if unexhausted in state court).

Petitioner cannot demonstrate that he was prejudiced by his counsel's failure to request the presence of the arresting officer or to introduce a statement from Walter Green.  First, defense counsel and the prosecution stipulated to the basic facts of petitioner's 2011 arrest.  *See* Reporter's Transcript on Appeal, Volume 1 at 33.  As such, it is unclear what a request for the arresting officer's presence or the introduction of a statement from Walter Green would have accomplished.  Indeed, the defense's motion to suppress evidence raised a purely legal argument, namely that a DNA sample taken pursuant to California Penal Code 296 (a) violated the United States Constitution.  Clerk's Transcript on Appeal, Volume I at 182-184, 225-235.  Finally, the trial court, in denying the defense's motion to suppress noted that the DNA evidence did not "solely and independently of the other evidence, [lead] to the issuance of the search warrant."  Reporter's Transcript on Appeal, Volume 1 at 62.  The trial court reasoned, in relevant part:

> Even assuming the DNA sample, again, in this scenario, was illegally obtained, the defendant, in my view has not made a prima facie showing of the causal connection between the DNA swab and the product of the search.  Why do I say that? Because in my view there's ample evidence, in fact, it is very strong evidence leading to probable cause contained in the remainder of the search warrant affidavit which would lead police officers and then a magistrate to conclude that there was sufficient evidence to issue a warrant and search the residences that were described.
>
> . . .
>
> In this case, in my view, even if I were to excise the one – I think it's one paragraph, in the numerous page affidavit in this case, if I were to excise the one paragraph of DNA, in my view there is still ample evidence which would support a finding of probable cause. And in my view, clearly based on the testimony today, the police would have sought that warrant and been able to execute it appropriately.

*Id*. at 62-64.  The trial court noted that other evidence which supported the issuance of a search warrant included: (1) surveillance video from the apartment complex where the last home invasion and sexual assault occurred; (2) surveillance video from a currency exchange where the Qatari Riyals were exchanged; (3) the fact that petitioner lived in the area where the invasions

/////

21

occurred and in the same complex as the sexual assault victim; and (4) that the victims' physical descriptions of the perpetrator closely tracked that of the petitioner. *Id*. at 61-62.

Petitioner's claim that his counsel should have filed a *Pitchess* motion is also unavailing. As respondent notes, this specific claim was never presented in any of petitioner's state habeas petitions. Nevertheless, the court will exercise its discretion to deny this unexhausted claim on the merits. *See Cone*, 556 U.S. at 451 n.3. In *Pitchess v. Superior Court*, 11 Cal.3d 531 (1974), the California Supreme Court held that a criminal defendant is entitled to discover the personnel records of law enforcement personnel if the information contained therein is relevant to his ability to defend against the prosecution's charges. *Id*. at 534-535. Here, petitioner contends that his trial counsel should have sought the arresting officer's personnel records to determine if he had a history of "arresting citizens for the mere purpose of taking their DNA." ECF No. 1 at 12. As noted above, the trial court determined that sufficient evidence independent of the DNA supported probable cause. As such, petitioner cannot demonstrate that he was prejudiced by his counsel's failure to file a *Pitchess* motion seeking the arresting officer's personnel records.

### b. Failure to Object to Prosecutorial Misconduct

Petitioner argues that his trial counsel was ineffective in failing to object to the prosecutor's comments about uncalled witnesses during closing argument. ECF No. 1 at 18-19. As noted *supra*, the court of appeal reasonably determined that these comments were not improper. As such, this court cannot conclude that trial counsel's failure to object to these comments amounted to constitutionally deficient performance. *See Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir. 1985) ("Failure to raise a meritless argument does not constitute ineffective assistance."). And although the court of appeal did note that his counsel's failure to object and seek an admonition would normally preclude appellate review of the prosecutor's comments, it nevertheless reached the merits of his misconduct claim after noting that he was also alleging ineffective assistance of counsel. *See Wright*, 2015 WL 4931489, at *7. Accordingly, he was not procedurally prejudiced by his counsel's failure to object.

/////

/////

1          **D.**    **Instructional Error**

2          Petitioner's final claim is that the trial court erred when it instructed the jury that "nothing

3   the parties say is evidence."  ECF No. 1 at 20.  He claims that this instruction precluded the jury

4   from weighing his trial testimony and thereby denied him the right to testify on his own behalf.

5   *Id.*  This claim was presented on direct appeal and the court of appeal denied it, reasoning:

6               In the oral instructions to the jury, the trial court gave the standard
7               CALCRIM No. 222 instruction as follows: "Evidence is the sworn
                testimony of witnesses, the exhibits admitted into evidence, and
8               anything else I told you to consider as evidence. [¶] Nothing that
                the attorneys say is evidence. In their opening statements and
9               closing arguments, the attorneys will discuss the case, but their
                remarks are not evidence. Their questions are not evidence. Only
10              the witnesses' answers are evidence. The attorneys' questions are
                significant only if they help you understand the witnesses'
11              answers. Do not assume that something is true just because one of the
                attorneys asked a question that suggested it was true...."

12              However, in the written instructions given to the jury, the word
                "attorneys" was replaced with the word "parties" as follows:
13              "Nothing that the *parties* say is evidence. In their opening
                statements and closing arguments, the *parties* discuss the case, but
14              their remarks are not evidence. Their questions are not evidence.
                Only the witnesses' answers are evidence. The *parties'* questions are
15              significant only if they helped you to understand the witnesses'
                answers. Do not assume that something is true just because one of
16              the *parties* asked a question that suggested it was true...." (Italics
                added.)
17
                Noting that where there is a discrepancy between the written and
18              oral instruction, the written instructions control, defendant argues
                that because he was a party to this action and his attorney was not,
19              the written instruction prohibited the jury from considering his trial
                testimony as evidence. This, he claims, denied his constitutional
20              right to testify on his own behalf. We conclude any error was
                harmless.
21
                We review the merits of the claimed instructional error even though
22              there was no objection below because defendant claims the
                instruction affected a substantial right, i.e., the right to testify on his
23              own behalf. (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1087.)

24              "When an appellate court addresses a claim of jury misinstruction,
                it must assess the instructions as a whole, viewing the challenged
25              instruction in context with other instructions, in order to determine
                if there was a reasonable likelihood the jury applied the challenged
26              instruction in an impermissible manner. [Citations.]" (*People v.
                Wilson* (2008) 44 Cal.4th 758, 803–804.) We also consider the
27              arguments made by counsel "in assessing the probable impact of
                the instruction on the jury." (*People v. Young* (2005) 34 Cal.4th
28              1149, 1202.)

Although the substitution of "parties" for "attorneys" in the instruction may have constituted a technical error, the error was harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. 18, 24 [17 L.Ed.2d 705].) Before the jury heard any testimony, the trial court gave CALCRIM No. 104 as follows: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence. Their questions are not evidence. Only the witnesses' answers are evidence...." The court gave this instruction again at the close of evidence. Also, as stated, the oral instruction referred to the attorneys rather than the parties. Thus, when the trial court gave essentially the identical instruction, but substituted the word "parties" for "attorneys" the jury must have understood that the distinction being made was between the statements of the witnesses—which was evidence—and the statements of the attorneys representing the parties—which was not evidence.

Furthermore, the jury understood that the defendant, as a party, did not give an opening statement or closing argument, nor did he ask questions. Therefore, the jury would have understood that the trial court was referring to defendant's attorney and the prosecutor when it gave the instruction. Finally, both the prosecutor and defense counsel reviewed defendant's testimony during closing argument. The jury would not have understood that it could disregard defendant's testimony, when the attorneys gave that testimony so much attention.

Considering all the above, there is no reasonable likelihood the jury understood the instruction to mean it could disregard defendant's testimony.

*Wright*, 2015 WL 4931489, at *9–10. This claim was raised in a petition for review to the California Supreme Court (Lodg. Doc. No. 5 at 5-8) and it was summarily denied (Lodg. Doc. No. 6).

### 1. <u>Applicable Legal Standards</u>

A challenged jury instruction does not warrant habeas relief merely because it is "undesirable, erroneous, or even 'universally condemned,'"; rather a petitioner must show that the instruction violated a right guaranteed by the Fourteenth Amendment. *Cupp v. Naughten*, 414 U.S. 141, 146 (1973). Prevailing on a claim of instructional error requires a petitioner to demonstrate that "an erroneous instruction 'so infected the entire trial that the resulting conviction violates due process.'" *Prantil v. California*, 843 F.2d 314, 317 (9th Cir. 1988) (quoting *Darnell v. Swinney*, 823 F.2d 299, 301 (9th Cir. 1987)). A determination of whether an erroneous instruction rises to this standard requires a court to evaluate the instruction "'in the context of the

overall charge to the jury as a component of the entire trial process.'" *Id.* (quoting *Bashor v. Risley*, 730 F.2d 1228, 1239 (9th Cir. 1984)).  It bears noting that the United States Supreme Court has "defined the category of infractions that violate fundamental fairness very narrowly." *Dowling v. United States*, 493 U.S. 342, 352 (1990) (internal quotation marks omitted).

### 2.  **Analysis**

The court of appeal's rejection of this claim was not unreasonable.  As noted *supra*, the instruction pursuant to CALCRIM No. 104, given prior to testimony, correctly noted that "[n]othing the *attorneys* say is evidence."  Clerk's Transcript on Appeal, Volume II, at 441. Additionally, the trial court provided the correct instruction orally.  Reporter's Transcript on Appeal, Volume 5, at 1273.  Finally, as the court of appeal noted, the context of the instruction - most notably its references to opening and closing arguments - should have alerted the jury to the fact that the instruction was excluding the attorneys' remarks rather than petitioner's trial testimony.

It bears reiterating that the bar for habeas relief on an instructional error claim is high and the standard by which this court reviews the state court's *Chapman* decision is a deferential one. In *Davis v. Ayala* the Supreme Court held that "[w]hen a *Chapman* decision is reviewed under AEDPA, a federal court may not award habeas relief under §2254 unless the harmlessness determination itself was unreasonable. . . . [a]nd a state-court decision is not unreasonable if fairminded jurists could disagree on [its] correctness."  135 S. Ct. 2187, 2199 (2015) (internal quotations and citations omitted).  The *Ayala* decision goes on to note that a petitioner arguing that the state court's rejection of his claim was unreasonable must demonstrate that the decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  *Id.* (internal quotations and citations omitted).  Petitioner has not met that burden here.  Accordingly, this claim must be denied.

/////

/////

/////

**IV. Conclusion**

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:  April 19, 2018.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE